UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

          Plaintiff,

v.

Chauncey Ray Morris (1) and
Reginald Lee Graves (2),

          Defendants.

No. 13-cr-236 (RHK/LIB)

**REPORT AND RECOMMENDATION**

---

      This matter came before the undersigned United States Magistrate Judge upon the parties' pretrial motions. This case has been referred to the undersigned Magistrate Judge for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on December 3, 2013, regarding the parties' pretrial discovery motions,[1] Defendant Chauncey Ray Morris's Motion to Suppress Evidence, [Docket No. 44], Defendant Reginald Lee Graves's Motion to Suppress All Physical Evidence, [Docket No. 49], Defendant Reginald Lee Graves's Motion to Sever, [Docket No. 51], and Defendant Reginald Lee Graves's Motion to Suppress Statements, [Docket No. 65]. For reasons discussed below, the Court recommends that Defendant Morris's Motion to Suppress Evidence, [Docket No. 44], be **DENIED**, that Defendant Graves's Motion to Suppress All Physical Evidence, [Docket No. 49], be **DENIED**, that Defendant Graves's Motion to Sever, [Docket No. 51], be **DENIED**, and that Defendant Graves's Motion to Suppress Statements, [Docket No. 65], be **DENIED**.

---

[1] The Court addressed the parties' discovery motions in a separate Order, [Docket Nos. 72, 73].

## I.      BACKGROUND AND STATEMENT OF FACTS[2]

### A.      Background

Defendants Morris and Graves are each charged with one count of aiding and abetting Assault with a Dangerous Weapon, in violation of Title 18 United States Code Sections 2, 113(a)(3), 1151, and 1153(a). (Indictment [Docket No. 1]).

The Court held a motion hearing on December 3, 2013, at which time the Court allowed the parties the opportunity to submit additional post-hearing briefing regarding Defendants' Motions to Suppress, [Docket Nos. 44, 49, 65]. Defendants' post-hearing briefing was due on December 17, 2013, and the Government's briefing was due on January 3, 2014. (Minute Entry [Docket No. 70]). Docket Numbers 44, 49, and 65 were therefore taken under advisement on January 3, 2014.[3]

### B.      Facts

On the morning of June 17, 2012, Red Lake Police Officer Justin Jourdain was patrolling the Barton's Camp area of the Red Lake Indian Reservation when, at approximately 7:00 a.m., Officer Jourdain overheard an all-units dispatch reporting shots fired near the Circle Pines housing development area of the reservation. Dispatch further advised that the suspect parties had fled the scene in a green Dodge Durango.

Upon immediately responding to the call and arriving at the Circle Pines housing area shortly thereafter, Officer Jourdain spoke with a male bystander, identified as Charlie Coloff, who reported witnessing the shots fired moments earlier and seeing a heavier male in a red shirt,

---

[2] The facts are derived from the December 3, 2013, testimony of Red Lake Police Officer Justin Jourdain, Red Lake Conservation Officer Shannon Barron, and Red Lake Police Criminal Investigator Paul A. Kwako, in addition to Government Exhibits 1, 2, and 3.

[3] As a result of the post-hearing briefing schedule and the Defendants' approaching trial date, February 24, 2014, the parties agreed to a shortened objections period – seven (7) days for objections to the report and recommendation, seven (7) days for responses to objections.

carrying what looked like an AK-47, and a second male shooter in black, carrying a shotgun. Mr. Coloff told Officer Jourdain that the males had just left the scene in a dark green Dodge Durango, in the direction of the Gonvick Truck Trail.

Red Lake Conversation Officer Shannon Barron also heard and responded to the June 17, 2012, shots fired dispatch. Conservation Officer Barron immediately proceeded to the Circle Pines housing area in his Ford F150 truck – a marked patrol vehicle – with lights and sirens. Officer Jourdain arrived on scene just before Conservation Officer Barron. Over the radio, Officer Jourdain informed Conservation Officer Barron that a witness observed a dark green Dodge Durango and two males – one in red, one in black – in connection with the shots fired call. Shortly thereafter, Conservation Officer Barron arrived on-scene and spoke with Mr. Coloff, who again described witnessing the shooters leave the scene in a dark green Durango.

The following pursuit of the suspect green Durango occurred immediately following and contemporaneous with the shots fired call. Conservation Officer Barron observed tire tracks, presumably left behind by the Durango, and took off in the same direction in which the Durango was alleged to have left the scene moments earlier. While Conservation Officer Barron attempted to follow the suspect vehicle, Officer Jourdain proceeded down Highway 89 to South Boundary Road, in an attempt to intercept the suspect vehicle. Shortly thereafter, Officer Jourdain came upon a Durango matching the description provided by Mr. Coloff, and he pursued with lights and sirens.

Testimony indicates that Officer Jourdain observed no other vehicles in the area at that time, and that there was little chance that any other vehicles aside from the suspect Durango were on the trail at that time.

Upon seeing Officer Jourdain's marked patrol, the Durango immediately reversed directions and headed back in the direction from which it came, refusing to pull over for several miles, despite Officer Jourdain's pursuit. Instead, the Durango – by all indications <u>intentionally</u> – ran into Conservation Officer Barron's marked vehicle, head-on. (<u>See</u> Gov't Ex. 1).

After the collision, four parties immediately exited the Durango. The front passenger was a heavier male wearing a red shirt, matching one of the descriptions provided by Mr. Coloff. At the motion hearing, Officer Jourdain identified the front passenger as Defendant Chauncey Ray Morris. Seated behind the driver was a second male dressed in black, matching the second description provided by Mr. Coloff. At the motion hearing, Officer Jourdain identified the second male as Defendant Reginald Lee Graves.

Although his vehicle had been hit head-on, Conservation Officer Barron got out of his vehicle and ordered the male in the red shirt, later identified as Defendant Morris, on the ground. Conservation Officer Barron testified that when Defendant Morris refused to comply, he kicked him in the side, and Defendant fell to the ground. Conservation Officer Barron arrested, handcuffed, and secured Defendant Morris. When conducting a search of Morris's person immediately incident to arrest, Officer Barron found shell casings on Defendant Morris's person. Upon his arrest, Defendant Morris was given a <u>Miranda</u> warning.

Conservation Office Barron testified that he did not observe any indications that Defendant Morris may have been injured or otherwise in need of medical attention of any kind, whether as a result of the vehicle collision or Officer Barron's takedown kick.

The officers similarly ordered the male later identified as Defendant Graves on the ground. Defendant Graves was not compliant; however, officers were able to subdue and arrest him. Defendant Graves was also read his <u>Miranda</u> rights upon arrest.

The testifying officers did not observe any indications that Defendant Graves may have been injured or otherwise in need of medical attention.

Both Defendant Graves and Defendant Morris were booked into custody and read their Miranda rights. Officer Jourdain testified that he did not observe any signs of injury or any indication that either man had sustained any injuries or required any medical attention upon arriving at the Red Lake Detention Center.

Law enforcement's pursuit of the green Durango and the subsequent collision and arrests happened immediately after and contemporaneous with the shots fired call.

Also at the motion hearing, Red Lake Police Criminal Investigator Paul A. Kwako, the criminal investigator assigned to the present case, testified. CI Kwako was the on-call investigator the day of the incident. After being informed that a vehicle suspected of involvement in a shots fired report had collided with a conservation vehicle, CI Kwako proceeded to the collision site and processed the scene. CI Kwako testified that the conservation vehicle had been "hit hard" with "some speed" by a green Dodge Durango. CI Kwako began photographing the scene, at which time he observed a knife, pepper spray, a live rifle round, a live .22 round, and a 30-round magazine in plain view in the suspect Durango. CI Kwako collected these materials as evidence.

Upon finishing his work at the collision site, CI Kwako proceeded to the house that had allegedly been the target of the shots fired call. CI Kwako observed that Melanie Sumner's house in the Circle Pines housing area had indeed been "shot up," as CI Kwako noted observable bullet holes in the sides of the residence, shell casings outside of the home, and even a bullet inside of the home. CI Kwako took statements from individuals at the house, including Melanie Sumner's.

The following day, on June 18, 2012, at approximately 11 a.m., CI Kwako arrived at the Red Lake Detention Center with FBI Special Agent Stefan Pluta, to speak with Defendants. CI Kwako testified that when he and SA Pluta interviewed Defendant Morris, he was not placed in restraints during the interview, and neither CI Kwako nor SA Pluta was armed during the interview. CI Kwako and SA Pluta introduced themselves and explained why they were there. Defendant Morris was given Miranda warnings and provided an FBI Form FD-395: Advice of Rights. (Gov't Ex. 2). CI Kwako explained each enumerated right on the Form, asked Defendant Morris if he understood each right, and checked-off the rights as Defendant indicated he understood them as he proceeded down the Form. Defendant Morris read and signed the form at approximately 11:15 a.m., after agreeing to speak with CI Kwako and SA Pluta. (Id.)

Defendant Morris stated that on June 16, 2012, he had been drinking through the night and into the early morning hours of June 17, 2012. Sometime in the early morning of June 17, 2012, someone offered to take a group of them on a drive. Defendant Morris went on to admit to the collision involving Conservation Officer Barron. However, when the conversation began to shift towards the shots fired call, Defendant Morris stopped talking and the interview concluded.

CI Kwako testified that Defendant Morris did not have any observable injuries, nor did Defendant Morris complain at any time of discomfort or injury. There were no indications that Defendant Morris did not understand the questions or what was going on. Neither CI Kwako nor SA Pluta made any threats or promises; neither deprived Defendant Morris of any food, water, the opportunity to use the bathroom facilities, etc.; nor did either law enforcement officer employ any coercive techniques. CI Kwako testified that there was no evidence of drug or alcohol impairment with respect to Defendant Morris.

Following Defendant Morris's interview, CI Kwako and SA Pluta interviewed Defendant Graves. They followed the same process they employed with Defendant Morris: the officers introduced themselves, explained the purpose of the interview, gave Defendant Graves a <u>Miranda</u> warning, and went over the Advice of Rights Form. CI Kwako explained each enumerated right on the Form, asked Defendant Graves if he understood each right, and checked-off the rights as Defendant indicated he understood them as he proceeded down the Form. Defendant Graves read and signed the Advice of Rights Form after agreeing to speak with the officers at approximately 11:34 a.m. (Gov't Ex. 3). As with Defendant Morris, at no point did either CI Kwako or SA Pluta make any threats or promises or in any other way coerce or intimidate Defendant Graves.

Defendant Graves told the officers that he had been drinking the night of June 16, 2012, into the early morning hours of June 17, 2012. Defendant Graves stated that a male (referred to as Keith, Keef, or Jules) offered to give the group a ride in a green Durango to the Circle Pines neighborhood. Defendant Graves then described the collision with Conservation Officer Barron's vehicle. Defendant Graves made no statements or admissions concerning the shots fired call. Defendant Graves gave a DNA sample and was generally cooperative during the interview.

## II.    DEFENDANT GRAVES'S MOTION TO SEVER, [DOCKET NO. 51]

Defendant Graves moves the Court for an order severing his case from that against his co-defendant, Chauncey Ray Morris. Defendant Graves generally argues that the investigation of Defendant Morris involves specific facts and evidence to be offered at trial against Defendant Graves, the admission of which will likely cause confusion and prejudice towards Defendant Graves, depriving him of a fair trial. Defendant Graves further alleges, in only general terms, that

"[t]here is a conflict of interest between the defendants that cannot be resolved absence severance." (Def.'s Mot. for Severance [Docket No. 51]).

A.      **Standard of Review**

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (internal quotation and citation omitted).

The Federal Rules of Criminal Procedure also provide that, if joinder creates prejudice to either the Government or a defendant, the Court may sever a trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11-cr-230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25-26 (D. Minn. Oct. 5, 2011) (Rau, M.J.) (citing Warfield, 97 F.3d at 1019), adopted by 2011 U.S. Dist. LEXIS 124904 (D. Minn. Oct. 26, 2011) (Frank, J.). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209-10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." Clay, 579 F.3d at 927 (citing United States v. Al-Esawi, 560

8

F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004).

> **B.    Analysis**

In the present case, Defendant Graves does not argue that joinder was improper under Rule 8(b). Rather, Defendant Graves argues – in only general terms – that severance pursuant to Fed. R. Crim. P. 14(a) is necessary in order to avoid potential prejudice and the mere possibility of an infringement of his Sixth Amendment confrontation rights.

"Defendants have a Sixth Amendment right to confront witnesses against them, and a Fifth Amendment right not to be made witnesses against themselves. 'In a joint trial, these rights collide when co-defendants implicate each other in confessions that are introduced into evidence.'" United States v. Banks, No. 11-cr-173 (MJD/JJK), 2011 U.S. Dist. LEXIS 77703, at *5 (D. Minn. July 1, 2011) (Keyes, M.J.), adopted by 2011 U.S. Dist. LEXIS 77195 (D. Minn. July 15, 2011) (Davis, C.J.).   In Bruton v. United States, the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's co-defendant had confessed and had "expressly implicat[ed]" the petitioner.  391 U.S. 123, 124, 124 n.1 (1968). The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n.2. The Supreme Court, however, concluded that,

> [T]he introduction of [the co-defendant's] confession posed a
> substantial threat to petitioner's right to confront the witnesses
> against him, and this is a hazard we cannot ignore. Despite the
> concededly clear instructions to the jury to disregard [the co-
> defendant's] inadmissible hearsay evidence inculpating petitioner,
> in the context of a joint trial we cannot accept limiting instructions

> as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redaction from co-conspirator testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incriminating statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n.10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected the suggestion that the rule in Bruton extend to confessions that are incriminating by connection as both impractical and unnecessary. Id. at 208-09.

In the present case, Defendant Graves has not supported his motion by identifying any specific "facially incriminating" statements that he believes would, if introduced at trial, prejudice him. Even if Defendant Graves had identified one or more facially incriminating statements made by Defendant Morris, "Bruton can be complied with by redaction – a possibility suggested in that opinion itself." Richardson, 481 U.S. at 209 (citing Bruton, 391 U.S. at 134 n.10). Nor has Defendant Graves articulated any specific reason why the jury would be unable to compartmentalize any such redacted evidence upon being given proper instructions to do so.

As expressed by the United States Supreme Court in <u>Zafiro</u>, 506 U.S. 534; and <u>Richardson</u>, 481 U.S. 200; and by the Eighth Circuit in <u>Clay</u>, 579 F.3d 919; <u>Al-Esawi</u>, 560 F.3d 888; and <u>Warfield</u>, 97 F.3d 1014; and by the District of Minnesota in <u>Hopkins</u>, 2011 U.S. Dist. LEXIS 127071, there is a strong preference in the federal courts for joint trials. Given that preference, and at this very early juncture, where Defendant Graves can only invite the Court to speculate as to what evidence the Government will actually seek to introduce at trial, or whether Defendant Morris will ultimately refuse to testify in his own defense thereby denying Defendant Graves an opportunity to cross examine, severance is not at this time appropriate:

> With respect to possible infringement of defendant['s] right to confront his co-defendant concerning recorded statements made by the co-defendant, the motion for severance can properly be determined at or near the time of trial at which time it can be determined whether the government will seek to introduce all or selected portions of the recorded statements, and whether [the co-defendant] will exercise his right to testify or his Fifth Amendment right. Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances. At present the motion for severance based upon speculative grounds is therefore premature.

<u>United States v. Billups</u>, No. 06-cr-129 (PJS/AJB), 442 F. Supp. 2d 697, 706 (D. Minn. 2006) (Boylan, M.J.); <u>see also</u> <u>Banks</u>, 2011 U.S. Dist. LEXIS 77703, at *7 ("<u>Bruton</u> protections can be re-evaluated" before trial "or at trial when actual testimony is proffered").

Consequently, Defendant Graves's Motion for Severance, [Docket No. 51], is **DENIED** without prejudice.

## III.   DEFENDANT GRAVES'S MOTION FOR SUPPRESSION OF ALL PHYSICAL EVIDENCE, [DOCKET NO. 49]

Defendant Graves moves the Court for an order suppressing all physical evidence seized, including Defendant's fingerprints and D.N.A., and for an order barring the Government from using the evidence, or any information directly or indirectly obtained therefrom, including

evidence seized from Defendant at the time of his arrest. (Def.'s Mot. for Suppression [Docket No. 49]).

Defendant Graves argues that law enforcement lacked the requisite probable cause to arrest him, necessarily requiring suppression of all evidence obtained incident to the arrest, including statements.

A.     **Standard of Review**

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per se</u> unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." <u>United States v. Davis</u>, 569 F.3d 813, 816 (8th Cir. 2009) (<u>citing</u> <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). Nevertheless, "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." <u>United States v. Robinson</u>, 414 U.S. 218, 224 (1973).

Defendant Graves does not dispute this well-settled legal principle but instead argues that there is no legal basis for his arrest; namely, it lacked probable cause. Equally well established is the principle that a warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." <u>United States v. Torres-Lona</u>, 491 F.3d 750, 755 (8th Cir. 2007). "A 'probability or substantial chance of criminal activity, rather than an actual

showing of criminal activity' is sufficient." United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008) (quoting Torres–Lona, 491 F.3d at 755).

In considering whether probable cause existed to arrest a defendant, the Court "examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks omitted).

### B.      Analysis

Law enforcement had probable cause sufficient to justify the warrantless arrest of Defendant Graves after the head-on collision with Conservation Officer Barron's patrol vehicle on June 17, 2012.

First, an eye-witness at the scene of the reported shots fired immediately provided law enforcement (both Officer Jourdain and Conservation Officer Barron) with physical descriptions of two male shooters upon the officers' prompt arrival on-scene: one male, heavier-set, in a red shirt, carrying a possible AK-47; and a second male, in black, carrying a shot gun. These descriptions would, soon after, be corroborated at the nearby scene of the vehicle collision, as the record indicates that Defendant Graves was arrested at the collision site dressed in black with a companion dressed in red.[4]

Second, multiple sources – immediately after the shots fired dispatch – corroborated the involvement of a green Dodge Durango in the reported shots fired incident. First, dispatch informed officers that the suspects involved in the shots fired had fled the scene in a green Durango. Second, upon the officers' arrival at the scene, eye-witness Charlie Coloff reported

---

[4] Although Defendant Graves argues that the Court received conflicting testimony regarding the precise color of Defendant Graves's shirt on June 17, 2012, testimony by Officer Jourdain is clear that an eye-witness identified a shooter dressed in black, in the company of a shooter dressed in red, and that Officer Jourdain observed Graves, in black, in the company of Morris, in red, at the scene of the collision. The weight of the evidence in the record indicates that law enforcement acted according to eye-witness information.

13

seeing the shooters flee in a green Durango. Third, Officer Jourdain and Conservation Officer Barron observed a green Durango in the area of the shots fired immediately following the report. Fourth, no officers reported seeing any other vehicles in the vicinity, narrowing the likelihood of another vehicle's involvement in the shots fired incident. Finally, the green Durango resisted law enforcement efforts to pull the vehicle over and ultimately it rammed head-on into a Red Lake conservation patrol vehicle.[5] At each point in time, as the incident unfolded, the involvement of a green Durango in the commission of a crime was time and again corroborated and provided law enforcement with probable cause to arrest those on board.

Most significantly, the described events – from the initial shots fired report, to the officer's arrival on-scene in the Circle Pines housing area, to the discussions with eye-witness Coloff, to the tracking and pursuit of the green Durango, to the collision and subsequent arrest of Defendant Graves – happened in short order, if not contemporaneously. Officers reacted and responded immediately each step of the way and followed "in progress" leads.

Although law enforcement had sufficient probable cause to arrest Defendant Graves based on the facts discussed above, the green Durango's failure to pull-over and Defendant Graves's resistance to arrest after the collision may also provide independent grounds for probable cause warranting an arrest. See, e.g., United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995) (holding that a defendant's resistance to arrest provided independent grounds for his arrest, as individuals are not authorized to use force to resist an arrest under Iowa law).

Defendant Graves's warrantless arrest was supported by probable cause and was thus lawful. As a result, any evidence obtained incident to Defendant Graves's arrest is supported by

---

[5] The testimony at the suppression hearing further indicated, by the on-scene, contemporaneous observations of the involved officers, that the green Dodge Durango intentionally rammed head-on into the Red Lake conservation vehicle.

the lawful arrest, and the Court recommends **DENYING** Defendant Graves's Motion to Suppress All Physical Evidence, [Docket No. 49].[6]

## IV.   DEFENDANT GRAVES'S MOTION TO SUPPRESS STATEMENTS, [DOCKET NO. 65]

Directly related to Defendant Graves's Motion to Suppress All Physical Evidence, [Docket No. 49], is Defendant Graves's Motion to Suppress Statements, [Docket No. 65]. Defendant Graves only generally moves the Court for an order suppressing all statements taken in contravention of his constitutional rights. (Def.'s Mot. to Suppress [Docket No. 65], at 1). Defendant Graves is alleged to have provided two statements in connection with the present case: Defendant Graves allegedly made a statement while in the back of a squad car after his arrest, and Defendant Graves gave a statement during a custodial interview.

Both of the statements at issue were unequivocally made while Defendant Graves was in custody. As a result, the Court need not consider whether Defendant Graves was in custody at the time he made the subject statements.

### A.   Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

---

[6] The Court recognizes that at no point does Defendant Graves identify any specific evidence obtained incident to his arrest, or specifically target any evidence requiring suppression. Docket No. 49 and Defendant Graves's supporting memorandum, [Docket No.71], references "evidence" only generally.

However, law enforcement officers "are not required to administer <u>Miranda</u> warnings to everyone whom they question." <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). "<u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." <u>Id.</u> (internal quotation omitted).

A defendant's waiver of his <u>Miranda</u> rights must be made voluntarily, knowingly, and intelligently. <u>Miranda</u>, 384 U.S. at 444. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must inquire whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

<u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

"The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004). The court "must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" <u>United States v. Syslo</u>, 303 F.3d 860, 866 (8th Cir. 2002) (quoting <u>United States v. McClinton</u>, 982 F.2d 278, 282 (8th Cir. 1992)). The United States Supreme Court has explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." <u>United States v. Turner</u>, 157 F.3d

552, 555 (8th Cir. 1998) (emphasis in original) (quoting <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was voluntary, knowing, and intelligently made, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." <u>Syslo</u>, 303 F.3d at 866.

Third, "[w]hether or not <u>Miranda</u> is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination." <u>United States v. Pankey</u>, No. 07-cr-214, 2007 U.S. Dist. LEXIS 86785, at *11 (D. Minn. Oct. 25, 2007) (DWF/RLE) (Erickson, C.M.J.) (citing <u>Dickerson v. United States</u>, 530 U.S. 428, 433-34 (2000)), <u>adopted by</u> 2007 U.S. Dist. LEXIS 84319 (D. Minn. Nov. 13, 2007) (Frank, J.). When analyzing voluntariness, the Court considers "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." <u>Dickerson</u>, 530 U.S. at 434. Furthermore, a statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." <u>United States v. Gallardo-Marquez</u>, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations and citations omitted; ellipses in original). Whether a defendant's will has been overborne is determined by looking at the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998). Courts consider a multitude of factors including the age of the defendant, the level of education of the defendant, the lack of advice to the accused on his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226

(1973); see also United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (stating that "officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. . . .  None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation cause the defendant's will to be overborne" (quotations and citation omitted).).

### B. Analysis

### 1. Statement made during transport to Red Lake Detention Center

There is no question that Defendant was "in custody" for the purposes of Miranda when he was handcuffed in the back of a Red Lake Police patrol vehicle after his arrest. Additionally, the record before the Court indicates that Defendant Graves was read a Miranda warning before he made any statements during the transport. However, the record is devoid of any evidence suggesting that Defendant Graves's statements were the product of custodial interrogation.

The record currently before the Court indicates only that Defendant Graves was "laughing" in the back of the squad car and speaking candidly about the head-on collision. Nothing in the record identifies Graves's alleged squad car statements with any greater specificity. More importantly, there is no evidence in the present record that Defendant Graves was interrogated by officers during the entirety of the transport. Absent any evidence that Graves was asked questions by law enforcement or coerced in any way to make such comments, nothing in the record indicates that Graves's squad car statements were anything but voluntary, independently made remarks. As a result, the Court recommends **DENYING** Defendant Graves's Motion to Suppress with respect to this first statement.

### 2.      Custodial interrogation statement

The Court must determine (1) whether Defendant Graves voluntarily, knowingly, and intelligently waived his Miranda rights, and (2) whether Defendant Graves's statements, a product of a custodial interrogation at the Red Lake Detention Center on June 18, 2012, were made voluntarily. Although Defendant Graves makes no specific arguments regarding the voluntariness of his custodial statements, the Court undertakes the analysis for the sake of complete judicial review.

As articulated in the facts section above, Defendant Graves was given a Miranda warning and informed of his rights via an FBI Form FD-395: Advice of Rights immediately prior to the commencement of his custodial interview. (Gov't Ex. 3). The record before the Court indicates that the law enforcement officers went over the form with Defendant Graves, explaining each right and inquiring as to whether Graves understood each right. Graves read the form, and Graves voluntarily signed the form after agreeing to speak with law enforcement without an attorney present. Nothing in the present record indicates that Defendant Graves displayed any signs of confusion or the inability to understand his rights. To the contrary, testimony indicates that Graves voluntarily and knowingly agreed to speak with law enforcement.

Additionally, nothing in the present record indicates the involvement of police coercion, a "necessary predicate" to finding that a waiver or statement is not voluntarily given. Connelly, 479 U.S. at 167.

Based on the above facts, the totality of the circumstances indicates that Defendant Graves, after being well-advised of his Miranda rights, did knowingly, voluntarily, and intelligently waive those rights.

Additionally, nothing in the present record indicates that Defendant Graves's statements were anything short of voluntary. Nothing in the record indicates the involvement of any "coercive police activity" by the interviewing agents. The record indicates that no threats, promises, or other deprivations or coercive techniques were involved in Defendant Graves's interview.

Additionally, there is no evidence that Defendant appeared intoxicated or otherwise mentally or physically impaired during his custodial interview. Although Defendant Graves may have been intoxicated during the very early morning hours of June 17, 2012, when he was initially arrested and transported to the Red Lake Jail, his interview with CI Kwako and SA Pluta the <u>following</u> day strongly suggests Defendant Graves's sobriety at the time of the interview. CI Kwako further testified that, at the time of the June 18, 2012, interview, he observed no signs of intoxication or other impairment when he interviewed Defendant at the Red Lake Jail, nor did Defendant Graves make any statements to that effect.

The totality of the circumstances indicates that (1) Defendant Graves did knowingly, voluntarily, and intelligently waive his <u>Miranda</u> rights, and (2) Defendant Graves made his June 18, 2012, custodial statements entirely voluntarily. Thus, the Court recommends **DENYING** Defendant Graves's Motion to Suppress Statements, [Docket No. 65].

## V.    **DEFENDANT MORRIS'S MOTION TO SUPPRESS EVIDENCE, [DOCKET NO. 44]**

Defendant Morris moves the Court for an order suppressing evidence seized as a result of his arrest and any and all statements obtained as a result of his post-arrest interrogation. Defendant Morris filed a motion to suppress evidence seized in connection with his arrest on June 17, 2012. (Def.'s Motion to Suppress [Docket No. 44]). Specifically, Defendant Morris moves to suppress the tangible evidence seized during a search of his person and during the

search of the Dodge Durango in which he had been a passenger, in addition to statements obtained later as a result of his post-arrest interrogation.

### A.        Standard of Review – Motion to Suppress Statements

See standard of review regarding suppression of statements that are the product of a custodial interview, Section IV.A, supra.

### B.        Analysis – Motion to Suppress Statements

Defendant Morris argues that the statements provided during his June 18, 2012, custodial interview at the Red Lake Detention Center were not voluntarily given, and thus require suppression.

As with regards to Defendant Graves's statements, there is no question that Defendant Morris was in custody during his interview at the Red Lake Detention Center on June 18, 2012. Additionally, the record before the Court indicates that Defendant Morris was given a Miranda warning before he made any statements during the interrogation and that he executed a signed waiver of said rights. CI Kwako testified that they discussed Defendant Morris's rights, that Defendant Morris indicated that he understood each right, that Defendant Morris read and signed an FBI Form FD-395: Advice of Rights, and that Defendant Morris agreed to speak with law enforcement.

Nothing in the present record indicates that Defendant Morris displayed any signs of confusion or the inability to understand his rights. To the contrary, the testimony indicates that Morris voluntarily, knowingly, and intelligently agreed to speak with law enforcement without an attorney present. Furthermore, CI Kwako observed no indications that Defendant Morris was suffering from any physical or mental impairment, nor did Defendant Morris complain of any such injuries or impairments. Rather, Defendant Morris's answers, responses, and general

demeanor gave every indication that he was alert, aware, and oriented, and capable of understanding his rights and his decision to waive them.

Additionally, nothing in the present record indicates the involvement of police coercion, a "necessary predicate" to finding that a waiver or statement is not voluntarily given. Connelly, 479 U.S. at 167.

Based on the above facts, the totality of the circumstances indicates that Defendant Morris, after being advised of his Miranda rights, did knowingly, voluntarily, and intelligently waive those rights. Thus, the only question before the Court is whether Defendant Morris's subsequent statements were coerced or otherwise not voluntarily given.

There is no evidence in the record indicating "coercive police activity" by either CI Kwako or SA Pluta during or immediately prior to Defendant Morris's custodial interview that would suggest that Defendant Morris's statements were anything short of voluntary. Furthermore, nothing in the record currently before the Court indicates that Defendant Morris was suffering from any lasting injuries either from the vehicle collision the day before or from Conservation Officer Barron's takedown kick immediately following that collision. Not only is the record devoid of any evidence that Defendant Morris suffered any injuries contemporaneous with the collision and takedown kick, but nothing suggests that Defendant Morris was in any way inhibited, incapacitated, or otherwise impaired the following day as a result of these incidents.

Evaluating the totality of the circumstances surrounding Defendant Morris's custodial statements to law enforcement on June 18, 2012, nothing in the record before the Court suggests that Defendant Morris's statements were anything but voluntarily, knowingly, and intelligently given. The totality of the circumstances indicates that (1) Defendant Morris did knowingly,

voluntarily, and intelligently waive his Miranda rights, and (2) Defendant Morris made his June 18, 2012, custodial statements entirely voluntarily. Thus, the Court recommends **DENYING** Defendant Morris's Motion to Suppress, [Docket No. 44], with respect to statements.

C.     **Standard of Review – Motion to Suppress Physical Evidence**

See standard of review regarding searches incident to arrest and warrantless arrests, Section III.A, supra.

D.     **Analysis – Motion to Suppress Physical Evidence**

As articulated above, "[i]t is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." Robinson, 414 U.S. at 224. Because Defendant Morris's initial arrest was supported by probable cause, the search of his person incident to arrest (revealing shell casing) was lawful.

As with Defendant Graves, law enforcement had probable cause sufficient to justify the warrantless arrest of Defendant Morris after the intentional head-on collision with Conservation Officer Barron's patrol vehicle on June 17, 2012.

First, an eye-witness at the scene of the reported shots fired immediately provided law enforcement (both Officer Jourdain and Conservation Officer Barron) with physical descriptions of two male shooters upon the officers' prompt arrival on-scene: one male, heavier-set, in a red shirt, carrying a possible AK-47; and a second male, in black, carrying a shot gun. These descriptions would, soon after, be corroborated at the nearby scene of the vehicle collision, as the record indicates that Defendant Morris was arrested at the collision site dressed in red with a companion dressed in black.

Second, multiple sources – immediately after the shots fired dispatch – corroborated the involvement of a green Dodge Durango in the reported shots fired incident. First, dispatch

informed officers that the suspects involved in the shots fired had fled the scene in a green Durango. Second, upon the officers' arrival at the scene, eye-witness Charlie Coloff reported seeing the shooters flee in a green Durango. Third, Officer Jourdain and Conservation Officer Barron observed a green Durango in the area of the shots fired immediately following the report. Fourth, no officers reported seeing any other vehicles in the vicinity, narrowing the likelihood of another vehicle's involvement in the shots fired incident. Finally, the green Durango resisted law enforcement efforts to pull the vehicle over and ultimately it rammed head-on into a Red Lake conservation patrol vehicle.[7] At each point in time, as the incident unfolded, the involvement of a green Durango in the commission of a crime was time and again corroborated and provided law enforcement with probable cause to arrest those on board.

Most significantly, the described events – from the initial shots fired report, to the officer's arrival on-scene in the Circle Pines housing area, to the discussions with eye-witness Coloff, to the tracking and pursuit of the green Durango, to the collision and subsequent arrest of Defendant Graves – happened in short order, if not contemporaneously. Officers reacted and responded immediately each step of the way and followed "in progress" leads.

Defendant Morris's warrantless arrest was supported by probable cause and was thus lawful. As a result, any evidence obtained incident to Defendant Morris's arrest is supported by the lawful arrest, and the Court recommends **DENYING** Defendant Morris's Motion to Suppress, [Docket No. 44], with respect to physical evidence.

## VI.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

---

[7] The testimony at the suppression hearing further indicated, by the on-scene, contemporaneous observations of the involved officers, that the green Dodge Durango intentionally rammed head-on into the Red Lake conservation vehicle.

**HEREBY RECOMMENDED**:

1. That Defendant Graves's Motion to Sever, [Docket No. 51], be **DENIED without prejudice**, as set forth above;

2. That Defendant Graves's Motion to Suppress All Physical Evidence, [Docket No. 49], be **DENIED**, as set forth above;

3. That Defendant Graves's Motion to Suppress Statements, [Docket No. 65], be **DENIED**, as set forth above; and

4. That Defendant Morris's Motion to Suppress Evidence, [Docket No. 44], be **DENIED**, as set forth above.


Dated: January 14, 2014                                    s/Leo I. Brisbois
                                                           The Honorable Leo I. Brisbois
                                                           U.S. Magistrate Judge


### N O T I C E

Upon the requests of both Parties, this Court allowed time for both parties to prepare and file additional written briefs on the suppression Motions. Consequently, and in light of the pending trial date of February 24, 2014, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 21, 2014**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections by **January 28, 2014, or within seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.